James **LANDON** (Plaintiff), Respondent,

v.

**NEW YORK CENTRAL RAILROAD COMPANY, a Corporation, Terminal Railroad Association of St. Louis, a Corporation, and Harry Warfield, Defendants,**

Terminal Railroad Association of St. Louis, a Corporation, and Harry Warfield (Defendants), Appellants.

No. 29333.

St. Louis Court of Appeals.

Missouri.

April 17, 1956.

Warner Fuller, Arnot L. Sheppard and John P. Montrey, St. Louis, for appellant Terminal R. R. Ass'n of St. Louis.

James M. Melton, Clayton, John P. Montrey, St. Louis, for appellant Harry Warfield.

Albright, Hodges & Nolan, Francis J. Nolan, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is an action by James Landon, as plaintiff, against the defendants, New York Central Railroad Company, Terminal Railroad Association of St. Louis, and Harry Warfield, to recover damages for personal injuries sustained by plaintiff as the result of a collision at a railroad crossing between a train of the New York Central Railroad Company and an automobile operated by plaintiff. Said injuries were alleged to have been caused by the negligence of all three defendants. The trial below resulted in a verdict in plaintiff's favor against the Terminal Railroad Association and Harry Warfield in the sum of $3,000. From the judgment on this verdict defendants Terminal Railroad Association and Harry Warfield have appealed.

The accident in question occurred at the intersection of Bremen Avenue, a public street in the City of St. Louis, and the tracks of defendant Terminal Railroad Association, a set of which tracks were used by defendant New York Central Railroad Company in the operation of its trains. The tracks of the Terminal, seventeen tracks in all, run north and south along or parallel to Hall Street, and intersect Breman Avenue, an east and west street, at approximately right angles.

The accident occurred at about 6:00 p. m. It was dark at the time. At the east side of the crossing is a single gate, and at the west side are two half gates which lower toward the center of Bremen Avenue. A red lantern was hanging on the south half of the west gate at the time in question. The accident occurred as plaintiff's automobile was being driven westwardly along Bremen Avenue over the crossing. The train of the New York Central was at the time going north on the eleventh track from the east gate, which track was referred to as the second main line track.

The tracks of defendant Terminal which intersect Bremen Avenue may be said to be in two "sets". The easterly set is referred to as "yard tracks," whereas the westerly set is referred to as "main line tracks." There is considerable distance separating the yard tracks from the main line tracks. In this area and on the north side of Bremen Avenue is a building or tower which houses the yardmaster's office and furnishes a headquarters for the crossing watchman. In this tower was equipment for raising and lowering the crossing gates, and on the outside of the building was a bell. This bell was about a foot or nine inches

in diameter. It was operated by hand. It was the duty of the crossing watchman to ring this bell when the occasion required. He did this by pulling a wire or cord. The bell would ring once each time the wire or cord was pulled. It was also the duty of the crossing watchman to lower the gates upon the approach of trains. The tower, bell, and gates were owned and operated by the defendant Terminal. The crossing watchman on the day plaintiff was injured was defendant Harry Warfield, an employee of defendant Terminal. There were three street lights located at the intersection—one at the northwest corner, one at the southwest corner, and one on the south side of Bremen Avenue, directly across from the tower and just east of the main line tracks.

Plaintiff approached the crossing from the east at a speed of approximately fifteen miles per hour. The east gate was up at that time. As he passed the gate plaintiff was about 200 feet from the point of collision. Just before passing the east gate plaintiff looked both ways, up and down the tracks. He saw no train. He proceeded across the tracks, and when he arrived at the fifth or sixth track he again looked in both directions. He saw no train approaching. He testified that a string of boxcars blocked his view to the south. These boxcars were south of Bremen Avenue and within ten or fifteen feet of the intersection. He further testified that after he got past the track on which the boxcars were located he had to cross one more track before he came to the track on which the accident happened. Immediately after passing the boxcars he again looked to the south and saw the train ten or fifteen feet from him. At that time the front of his automobile was upon the track on which the train was approaching. He heard no whistle or bell as he came to the point of the accident. Neither did he hear the tower bell being sounded. He further stated that his automobile, a two-door Hudson, was in "A–1 condition" and could have been stopped in ten or fifteen feet.

At the time in question there was a cardboard in the front window on the driver's side of plaintiff's automobile. It occupied the rear portion of the window and was about eight or ten inches in width. According to plaintiff, no part of the cardboard was forward of his shoulder as he sat in the driver's seat, and it did not obstruct his view to the south.

Defendant Harry Warfield was the tower watchman on duty at the time. He first saw plaintiff's car when it was 100 to 150 feet east of the east gate. He testified that at that time he could not have lowered the east gate without endangering the gate or automobile. It would have taken "maybe fifteen, maybe thirty seconds" to lower the gate. He stated that the west gates were down at that time. The train was approximately four blocks south of the crossing when he first saw it. He heard the whistle of the engine a city block, plus 200 feet or more, south of Bremen Avenue, and according to his testimony the whistle was still blowing as "it came to the Bremen Avenue crossing."

Warfield did not ring the bell, though it was in good working order. When asked why he did not ring the bell Warfield testified that "when it was apparent to me that the accident was going to happen, I just froze where I was at and caught my breath, and expected to have the whole tower knocked out from under me." He stated that he determined that there was going to be an accident when the automobile was about thirty feet from the train. In a deposition taken before trial Warfield testified that it became apparent to him that there would be an accident when the automobile was 100 feet from the point of collision.

Warfield stated that the train was traveling 20 to 25 miles per hour and that it did not slacken its speed from the time he first saw it until the collision; that the headlights on the engine were burning. Warfield stated he could not say that the bell on the engine was ringing.

Warfield's deposition was introduced at the trial. In said deposition he stated that he first saw plaintiff's automobile when it was 400 feet east of the east gate. He

further testified that after he saw this train coming four blocks away, "I looked down the street and noticed this fellow coming down by the Krey Packing sheds and I felt that he had plenty of time to get across and I put out the order board for the train to go past the tower, and hollered downstairs that the train was out of North Market Street, waited for the automobile to approach the crossing and I thought it would stop there, I looked and he wasn't close enough to get across in front of the train and so I left the west gates down figuring he would stop besides the tower." He further testified that he could have lowered the gates when he first saw plaintiff's car.

Sergeant Dan Ferry of the St. Louis Police Department was called as a witness for plaintiff. This officer testified that he interviewed defendant Harry Warfield a day or two after the accident, at which time Warfield stated that he saw plaintiff's automobile and thought it had ample time to make the crossing before the train reached Bremen Avenue. He further testified that Warfield stated that he let the west gates down after the automobile had entered the crossing, hoping that plaintiff would see the gates lowered and stop before reaching the point of collision.

Officer Thomas Kelling of the St. Louis Police Department also testified for plaintiff. He was called to the scene of the accident to make a police investigation. He saw no boxcars south of Bremen that would block the vision of one crossing the tracks. He testified that Warfield made statements to him to the effect that Warfield saw plaintiff's automobile approaching the crossing but that he misjudged its speed and by that time the automobile had already passed the first gate when he lowered the west gates, hoping he could stop the automobile in time to keep it from getting on the last set of main line tracks.

Plaintiff testified he knew that a watchman was customarily stationed in the tower and that a bell was located on the outside of the tower. He had heard the bell rung on previous occasions when a train was approaching the crossing, and that when the bell was rung it meant that a train was coming on the main track. He stated that if the bell had been rung when he was 100 feet from the main line track it would have meant to him that a train was coming and he would have stopped. He could easily have stopped when he was fifty feet back if the bell had been rung. He stated that he at no time saw the west gates down.

Several of the defendant Terminal's employees who were in the vicinity of the intersection testified on behalf of said defendant. They all testified that there were no boxcars parked south of Bremen Avenue at the time; that the whistle on the engine was blowing as the train approached the crossing, and that the east gate was up and the west gates down at the time.

Neither defendant Harry Warfield nor defendant New York Central Railroad Company offered evidence in the case.

Plaintiff submitted his case to the jury as to both appellants on the humanitarian doctrine, predicated on the failure of Warfield to warn plaintiff by ringing the hand operated tower bell. Appellants contend that it was error to submit the case on such theory for the reason that the humanitarian doctrine cannot be applied to the conduct of a person not in charge of the injuring instrumentality. It is urged that to extend the doctrine to cases of the character here presented would invite confusion in the law, in that it would be necessary, in order to make a case, to show not only that the plaintiff was oblivious, but also that the train crew was unaware of the plaintiff's peril.

The position of peril, which is a necessary condition for the imposition of liability on the part of a defendant under the humanitarian doctrine, may be affected by obliviousness on the part of the train crew in cases of this character. But this fact should not, in our opinion, prevent the application of the doctrine. It is properly a matter for consideration by the jury in fixing the limits of the zone of peril.

We fail to see how it would introduce into the case such uncertainty as to render it inexpedient to apply the doctrine to one who has assumed the duty of warning at a public railroad crossing. The doctrine has been so applied. Wolters v. Chicago & Alton Ry. Co., Mo.App., 193 S.W. 877; Kenan v. Withers, 137 Fla. 561, 188 So. 95.

It is next urged that there was no evidence from which the jury could find that Warfield was chargeable with knowledge of plaintiff's obliviousness.

■■ The evidence shows that plaintiff was at all times within Warfield's view from the time he first saw plaintiff, 100 to 150 feet east of the east gate, until the collision. Plaintiff was traveling at the rate of 15 miles per hour. He testified on direct-examination that he had no occasion to change the speed of the car as he proceeded over the crossing. And while it is true that on cross-examination he admitted having testified truthfully in a deposition that he had pressed down on his brakes when within fifty feet of the track on which the accident occurred, on direct-examination he stated that what he meant was that he tested his brakes before he reached the crossing. Thus, taking the evidence in the light most favorable to plaintiff, which under the law we are required to do, we must find that plaintiff proceeded across the tracks at an undiminished speed of 15 miles per hour. The train was approaching at that time. Its whistle was blowing, a fact which Warfield knew. Warfield also saw the plaintiff continuing toward the track, without slackening his speed, until Warfield suddenly realized that there was going to be an accident. He fixed this point at 30 feet from the track, but it could be reasonably found from the evidence that he should have realized it sooner. We believe there was ample evidence in the record to charge Warfield with knowledge of plaintiff's obliviousness at a time when a sounding of the tower bell would have sufficed to warn plaintiff so that he could have stopped short of the point of collision.

■ It is next urged that inasmuch as the train whistle was sounded prior to the accident, plaintiff may not have a recovery on an alleged humanitarian failure to warn. Appellants say that plaintiff was given an adequate warning by the locomotive whistle. It is sufficient to dispose of this point adversely to appellants' contention to say that appellants were not relieved of their duty to warn because the operator of the train performed his duty in the premises. Furthermore, it is clear from the evidence that the whistle warning was not adequate. Plaintiff did not hear it, a fact that should have been apparent to Warfield.

Appellants' last point is that to permit plaintiff to recover for failure to sound the tower bell would be to allow a recovery on speculation and conjecture; that since the locomotive whistle was blown and not heard by plaintiff, it would be pure guesswork to hold that the tower bell would have warned the plaintiff of the approaching danger.

■ Plaintiff testified that on prior occasions he had heard the bell sounded when trains were approaching on the main track. The tower bell was on the outside of the tower and in close proximity to plaintiff's automobile when plaintiff was 100 feet from the point of collision. We cannot say as a matter of law that a warning sound from the bell would have been unavailing. Whether the sounding of the tower bell would have warned plaintiff was a question for the jury.

Finding no error in the record, the judgment is affirmed.

NICK T. CAVE and GEORGE P. ADAMS, Special Judges, concur.